DELBELLO DONNELLAN WEINGARTEN
WISE & WIEDERKEHR, LLP
*Attorneys for the Debtors*
One North Lexington Avenue
White Plains, New York 10601
(914) 681-0200
Jonathan S. Pasternak, Esq.
Julie Cvek Curley, Esq

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------X

In re:

97-111 Hale, LLC, and
100-114 Hale, LLC,

                           Debtors.

----------------------------------------------------------------X

GRAND PACIFIC FINANCE CORP.,

                           Plaintiff,

                  -against-

97-111 HALE, LLC, 100-114 HALE, LLC, *et al.*,

                           Defendants.

----------------------------------------------------------------X

97-111 HALE, LLC, 100-114 HALE, LLC, ELI
BOBKER, BEN BOBKER and JOE BOBKER,

                           Counterclaim-Plaintiffs/
                           Crossclaim-Plaintiffs,

                  -against-

GRAND PACIFIC FINANCE CORP.,

                           Counterclaim-Defendant,
             and

FINANCIAL ONE GROUP, *et al.*,

                           Crossclaim-Defendants.

----------------------------------------------------------------X

Chapter 11
Lead Case No. 15-22381 (RDD)

**THIRD AMENDED
VERIFIED ANSWER,
AFFIRMATIVE DEFENSES,
COUNTERCLAIMS AND
<u>CROSSCLAIMS</u>**

Adversary Proceeding
Case No. 15-08224 (RDD)

15-08224-rdd    Doc 5    Filed 06/01/15    Entered 06/01/15 18:12:30    Main Document
Pg 2 of 45

Pursuant to C.P.L.R. § 3025(b), Defendants 97-111 Hale, LLC, 100-114 Hale, LLC, by their undersigned counsel, as and for their Second Amended Verified Answer to the Verified Complaint (the "Complaint") of Grand Pacific Finance Corp. ("Plaintiff" or "Grand Pacific"), along with counterclaims and crossclaims, amend their answer and aver, upon information and belief, in response to the corresponding numbered paragraphs of the Complaint as listed below, state and allege as follows:

## I. ANSWER

The Parties

1.      Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "1".

2.      Deny the truth of the allegations set forth in paragraph "2".

3.      Admit the truth of the allegations set forth in paragraph "3".

4.      Admit the truth of the allegations set forth in paragraph "4", except that they deny to the extent that Defendant is described as liable.

5.      Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "5".

6.       Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "6".

7.      Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "7".

8.      Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "8".

<u>The Loan Documents</u>

9.      Admit the truth of the allegations set forth in paragraph "9".

10.      Admit the truth of the allegations set forth in paragraph "10", except that they deny knowledge or information sufficient to form a belief as to the truth of the allegations made regarding the last sentence of paragraph "10".

11.      Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "11".

12.      Deny the truth of the allegations set forth in paragraph "12".

13.      Admit the truth of the allegations set forth in paragraph "13" except that they deny to the extent that Defendants are described as liable.

14.      Admit the truth of the allegations set forth in paragraph "14", except that they deny knowledge or information sufficient to form a belief as to the truth of the allegations made regarding the second sentence of paragraph "14".

15.      Deny the truth of the allegations set forth in paragraph "15".

16.      Respectfully refer to the Court for resolution of all allegations regarding the legal meaning and legal import of the "Note and Mortgage" as set forth in paragraph"16".

17.      Respectfully refer to the Court resolution of all allegations regarding the legal meaning and legal import of the "Note and Mortgage" as set forth in paragraph "17".

18.      Respectfully refer to the Court resolution of all allegations regarding the legal meaning and legal import of the "Note and Mortgage" as set forth in paragraph "18".

19.      Respectfully refer to the Court resolution of all allegations regarding the legal meaning and legal import of the "Note and Mortgage" as set forth in paragraph "19".

20.      Respectfully refer to the Court resolution of all allegations regarding the legal meaning and legal import of the "Note and Mortgage" as set forth in paragraph "20".

Borrower's Default Under the Loan

21.      Respectfully refer to the Court all questions of law set forth in paragraph "21" and otherwise deny that Defendants are liable to Plaintiff as alleged in the remainder of that paragraph.

22.      Deny the truth of the allegations set forth in paragraph "22".

23.      Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "23".

24.      Admit the truth of the allegations set forth in paragraph "24".

25.      Deny the truth of the allegations set forth in paragraph "25".

## II. AFFIRMATIVE DEFENSES

As and for a First Affirmative Defense

26.      The Complaint, in whole or in part, fails to state a claim upon which relief may be granted.

As and for a Second Affirmative Second Defense

27.      Plaintiff has failed to mitigate its damages.

As and for a Third Affirmative Defense

28.      Plaintiff's claim is barred, in whole or in part, by the applicable statues of limitations.

As and for a Fourth Affirmative Defense **(Stricken)**

29. ~~Plaintiff's claims are barred pursuant to the doctrine of estoppel.~~

As and for a Fifth Affirmative Defense

30. Plaintiff's claims are barred pursuant to the doctrine of waiver.

As and for a Sixth Affirmative Defense

31. Plaintiff's claims are barred pursuant to the doctrine of laches.

As and for a Seventh Affirmative Defense **(Stricken)**

32. ~~Plaintiff's claims are barred pursuant to the doctrine of unclean hands.~~

As and for a Eighth Defense **(Stricken)**

33. ~~Plaintiff's claims are barred as a direct result of Plaintiff's conduct, which includes, *inter alia*, breach of fiduciary duty, breach of contract and fraud.~~

As and for a Ninth Affirmative Defense **(Stricken)**

34. ~~Plaintiff's claims are barred because Plaintiff engaged in fraudulent conduct to induce 97-111 Hale, LLC and 100-114 Hale, LLC and Joe Bobker to execute the note and mortgage in question in this action. Consequently, the note is void and Plaintiff's mortgage lien is subject to expungement.~~

35. ~~In order to induce Defendants to retain the real property (the "Hale Project") and to sign the note which is the subject of this action, plaintiff Grand Pacific and counterclaim defendants Belton Lee and Michael Lin, who each are or were, at all relevant times, officers of~~

~~Grand Pacific, represented to Defendants that Grand Pacific's objective underlying the note and mortgage was to enter into a joint venture with Defendants with respect to the Hale Project. Grand Pacific, Lee and Lin further represented to Defendants that Grand Pacific obtained two outside investors (counterclaim defendants Global One Corp. and 366 Madison, Inc.) to provide equity financing in addition to Grand Pacific's note and mortgage. However, both Global One and 366 Madison, Inc. were secretly affiliated with and controlled by Grand Pacific, Belton Lee, Michael Lin, Robert W. Heinemann, J. Huang and Louise Varsos, all of whom acted together to hinder and prevent development of the Hale Project and thereby prevent repayment of the note and mortgage.~~

As and for a Tenth Affirmative Defense **(Stricken)**

36.    ~~Plaintiff's claims against defendant Joe Bobker are barred because Grand Pacific fraudulently created a false Social Security number for defendant Joe Bobker in connection with the note and mortgage upon which Plaintiff bases all of its claims in this action. Grand Pacific engaged in this fraudulent conduct in order to utilize, in conjunction with a note and mortgage, a form of guaranty by Joe Bobker that the parties never intended to be effective.~~

As and for an Eleventh Affirmative Defense **(Stricken)**

37.    ~~All of Plaintiff's claims as against Joe Bobker are barred because Joe Bobker's guaranty with respect to the note and mortgage was never intended to be, and never became, effective.~~

As and for a Twelfth Affirmative Defense

38.    Defendants reserve the right to assert additional affirmative defenses at such time and to such extent as warranted by discovery and the development of facts and claims in this action.

39.    Defendants deny all allegations contained in all "Wherefore" clauses set for the in the Complaint.

40.    Any allegations of the Complaint not answered above are hereby denied.


## III. COUNTERCLAIMS AND CROSSCLAIMS

Preliminary Statement

41.    Defendants and counterclaim/crossclaim plaintiffs, ELI BOBKER, BEN BOBKER and JOE BOBKER, known informally as the Bobker Group (hereinafter, the "Bobker Group" or "Defendants") are real estate developers who enlisted financer, plaintiff/counterclaim defendant, Grand Pacific Finance ("Grand Pacific" or "Plaintiff"), as a lender in a real estate development project in White Plains, New York (the "Hale Project" or "Project") owned by Defendants 97-111 HALE, LLC, 100-114 HALE, LLC (the "Hale entities'). Rather than behave as the lender it held itself out to be, Plaintiff colluded to introduce secretly affiliated entities (Global One Corp., 366 Madison, Inc., and United Asian Funds, LLC[1]) as additional investors in the Hale project. Moreover, to safeguard its undisclosed affiliates' positions and to maximize its own profits, Plaintiff with and through the Secret Affiliates fraudulently acquired all outstanding notes on the Hale project in violation of its role in the LLC Venture.

42.    Through the actions of Grand Pacific and the Secret Affiliates, as discussed below, the Bobker Group was induced to bear an unfair and greater proportion of the risk of the

---

[1] These parties will be collectively referred to herein as, the "Secret Affiliates."

project in terms of the loan with Grand Pacific and was deprived of the "equal playing field" that the LLC provided between its Members in that monies would be made or lost on a pro-rata basis as per the terms of the agreement. The actions of Grand Pacific and the Secret Affiliates, that began at the outset of the formation of the "LLC Partnership" caused the Bobker Group not only to lose about $4,000,000.00 in invested capital, but also the profit it would have made on the proposed sale of the Hale properties.

43.      Rather than behave as the unrelated commercial lenders and investors they purported to be, Grand Pacific and the Secret Affiliates colluded to introduce secretly affiliated entities in a "Trojan Horse"-type scheme into the Hale project. In addition, Grand Pacific and the Secret Affiliates burdened the Hale project with additional and unnecessary debt, and collected duplicative and unnecessary origination and exit fees on the subject loan.

44.      Their fraudulent misconduct resulted in millions of dollars of unnecessary loans, erosion or eradication of equity in the project, and funds wrongfully diverted from the proceeds of the Hale Project for the personal benefit of the Secret Affiliates and senior employees of Grand Pacific.

45.      Moreover, Plaintiff has continued its wrongdoing by bringing the instant foreclosure action, as well as a breach of contract action regarding additional notes on the Hale properties (the "Sterling Notes"), in the Supreme Court, County of New York, as Grand Pacific Finance Corp. v. 97-111 Hale, LLC et al., (Index No. 6011164/09) where Plaintiff obtained judgment. Plaintiff's attorney has admitted in a sworn affidavit that his client had kept him in the dark about the improper financial transactions between Crossclaim Plaintiffs and Secret Affiliates. Plaintiff's Chief Financial Officer has also admitted during her deposition under oath that she was not aware of the improper financial transactions between Crossclaim Plaintiffs and

Secret Affiliates during her sworn testimony in front of a Court-appointed referee to determine the amount of the judgment.

46.     Defendants and Crossclaim Plaintiffs seek compensatory and punitive damages, and expungement of all notes and guarantees.


## A.     The Parties

The Counterclaim Plaintiffs and Crossclaim Plaintiffs

47.     Defendant and Counterclaim/Crossclaim Plaintiff 97-111 Hale, LLC is a limited liability company organized under the laws of New York, which maintains an office in New York County.

48.     Defendant and Counterclaim/Crossclaim Plaintiff 100-114 Hale, LLC is a limited liability company organized under the laws of New York, which maintains an office in New York County.

49.     97-111 Hale, LLC, 100-114 Hale, LLC and Hale Club, LLC (collectively, the "Hale LLCs") are the owners and developers of a residential and retail parcel located on Hale Avenue, in White Plains, New York (the "Hale Project").

50.     Defendant and Counterclaim/Crossclaim Plaintiff Joe Bobker is an individual who resides in Nassau County, New York.  Joe Bobker has been engaged in the field of residential and commercial real estate development, and has directed or completed real estate development projects in Australia, in Los Angeles and in the New York Metropolitan area.

51.     Counterclaim/Crossclaim Plaintiff Eli Bobker is an individual who resides in Nassau County, New York.

52.     Counterclaim and Crossclaim Plaintiff Ben Bobker is an individual who resides in Nassau County, New York.

9

53.     Eli Bobker, together with Ben Bobker, manages the Hale LLCs.[2]

Counterclaim and Crossclaim Defendants

54.     Counterclaim Defendant, Grand Pacific, is a financial institution which, at all relevant times, maintained an office at 41-99 Main Street, Flushing, New York and regularly engages in real estate lending activities in the New York metropolitan area, and in New York County.

55.     Financial One Corp. ("Financial One" or "FO") is a financial institution based in Taiwan, which maintains offices in the Cayman Islands.  Financial One, which is listed on the Singapore Stock Exchange and conducts business in New York through Grand Pacific, which Financial One wholly owns or controls.

56.     Grand Pacific Holdings N.V.   ("GPUSA") is a Singapore-based financial institution with an address at 20 Raffles Place, Ocean Tower unit, 16-06/08 Singapore 048620. Grand Pacific is a wholly-owned subsidiary of GPUSA, which itself is a subsidiary of Financial One.

57.     André J.L. Koo ("A.Koo") is the executive chairman and controlling shareholder of Financial One who, on information and belief, controls Global One Corp.

58.     A.Koo, on information, and belief deposited monies into Global One Corp. which were invested in the Hale Project.

59.     Theodore Jer-Jyh Chen, a/k/a Ted Chen, is an individual residing in the State of California; was, at all times relevant to this action, a Director of FINANCIAL ONE in charge of all of FO's operations in the United States of America, which included, overseeing all of the operations in the United States of FO's subsidiary, Plaintiff, Grand Pacific.

---

[2] Joe Bobker, Eli Bobker and Ben Bobker, collectively, will be referred to herein as the "Bobker Group".

60.     Ted Chen is currently the President and Chairman of Grand Pacific Holdings Corp.

61.     Belton Yu Chung Lee, a/k/a Belton Lee ("Lee") is an individual residing in Queens County, New York.   At all relevant times and until 2009, Lee was a Senior Vice President of Grand Pacific.

62.     Lee is an owner and member of Fifth Field LLC.

63.     Michael Chih Chang Lin a/k/a C.C. Lin a/k/a Michael Lin ("Lin") is an individual who resides in Queens County and/or Nassau County, New York.   Lin was, at all relevant times, the Chairman of Grand Pacific, an Executive Officer of Financial One and, upon information and belief, also controlled Global One Corp and has signatory authority on behalf of Global One.

64.     Michael Lin and C.C. Lin are one and the same.

65.     Michael Lin has signed checks and other legal and financial instruments as both "Michel Lin" and "C.C. Lin".

66.     On information and belief Lin is also a director on behalf of 366 Madison, Inc.

67.     On information and belief Jeffrey Koo Sr., the majority shareholder of China Trust Bank and FINANCIAL ONE, is also the owner of 366 Madison, Inc.

68.     On information and belief, Lin has signatory authority on behalf of 366 Madison, Inc. and Global One.

69.     On information and belief, Lin has signed financial documents for GLOBAL ONE on behalf of John Huang.

70.     Robert Heinemann ("Heinemann") is an individual residing in or regularly employed in Queens County, New York.   At all relevant times, Heinemann was President of Grand Pacific.

71.     On information and belief, Heinemann is also a director of 366 Madison, Inc.

72.     On information and belief, Heinemann has signatory authority on behalf of 366 Madison, Inc.

73.     On information and belief, Heinemann has signed mortgages and deeds for 366 Madison, Inc.

74.     Kenny Huang ("K.Huang") is an individual residing in New Jersey, who conducted business with the Hale LLCs in New York.  Kenny Huang, upon information and belief, signs for United Asian Funds, LLC.

75.     Louise Varsos ("Varsos) is a Senior VP, Grand Pacific Finance Corp. with her principal place of business at 41-99 Main Street, Floor 2, Flushing NY 11355-3821.

76.     On information and belief, Varsos has signed deeds, checks and other financial instruments on behalf of Grand Pacific to Global One, as owned by Andre Koo and operated by Lin.

77.     On information and belief, Varsos has signed deeds, and on information and belief, signed checks and other financial instruments on behalf of Grand Pacific affiliates (Grand Pacific Main Street Development, LLC) to 366 Madison, Inc., as owned by Jeffrey Koo Sr. and operated by James Huang, Michael Lin and Robert W. Heinemann before Grand Pacific became involved in the Hale Project.

78.     On information and belief, Varsos and Lin signed checks from Grand Pacific to Global One Corporation, before Grand Pacific became involved in the Hale Project.

79.     United Asian Funds, LLC ("UAF") is a limited liability company organized under the laws of New York.

80.     On information and belief, K.Huang is the managing member of UAF, but UAF was in fact controlled by Lee.

81.     Global One Corporation ("Global One" or "GO") is a financial institution with offices located in California and New York.

82.     On information and belief, the California offices of GLOBAL ONE are in the same building as the California offices of Plaintiff, Grand Pacific.

83.     Global Holding Corp. ("Global Holding" or "GHC") is a financial institution duly authorized to conduct business in the State of New York.

84.     On information and belief, Global Holding and Global One are affiliates.

85.     On information and belief, all or some monies invested by Global One in the Hale Project were supplied by Global Holding.

86.     Lin is a principle shareholder and an officer of Global One.

87.     Chinatrust Bank (U.S.A.) ("Chinatrust" or "CTB") is a regulated finance institution with its main office located at 366 Madison, NY, and a branch office located at 41-99 Main Street, Flushing, New York, which is the same United States address listed for Grand Pacific and 366 Madison.

88.     The New York branch offices of 366 Madison are in the same building as Grand Pacific, at 41-99 Main Street, Flushing, New York.

89.     While "Chinatrust" is not a party herein, representations regarding CTB play a significant role in the fraudulent behavior of the parties involved.  As such, Chinatrust is a financial institution controlled by the Koo family duly authorized to conduct business in the State of New York.

90.     On information and belief, Chinatrust and Grand Pacific are commonly owned by the Koo family.

91.     On information and belief, Chinatrust was used as the source of financing for a number of real estate/construction projects in which Lin and Lee were involved personally or through any one of their companies or partnerships.

92.     The Directors of 366 Madison are James Huang, Michael Lin and Robert W. Heinemann.

93.     Fifth Field, LLC ("Fifth Field") was a New York limited liability company, now inactive, which maintained an office in Queens County, New York.

94.     Fifth Field, at all relevant times, was controlled by Belton Lee and Michael Lin, its major shareholder.

95.     United Asian Funds, LLC, Global One, 366 Madison and Fifth Field, LLC, are controlled by, Grand Pacific, the Koos, Michael Lin, Belton Lee, the K.Huang, James Huang, Robert W. Heinemann, and Louise Varsos.

**B.      Facts Common to All Counterclaims & Crossclaims**

The Hale Project

96.     Prior to the recession, during the past decade, the downtown area of White Plains, New York experienced steady growth in the number of upscale retail developments and office towers.  This set the stage for many under-developed residential sites to rise in value.  The Hale LLCs were formed in or about mid-2004 to take advantage of the White Plains real estate market.

97.     In or about July 2004, the Hale LLCs purchased two residential parcels, located at 97-111 Hale Avenue and 100-114 Hale Avenue in White Plains (the "Hale Project").  This acquisition proceeded with a $2,375,000 loan from Chinatrust, which Grand Pacific arranged, and a $1,650,000 loan from Grand Pacific.  In or about July 2005, the Hale LLCs obtained $5.5

million in senior financing from Sterling Bank (the "Sterling note"), and retired the Chinatrust and Grand Pacific acquisition loans.

98.      In or about early 2006, the Hale LLCs also obtained a Site Plan Approval from the White Plains municipal authorities to construct two condominium buildings of 70 and 57 condominium units at the Hale Project.  At the time, the Hale LLCs were interested in selling the properties at a profit due to the increased value resulting from the Site Plan Approvals.  The Hale LLCs listed the Hale Project for sale through Marcus & Millichap, a broker in Manhattan.

The Gurevich Offer and the Fraudulent Joint Venture

99.      By mid-2006, Grand Pacific and their various officers were aware of the profit potential in the Hale Project.  Grand Pacific and their officers made plans to tap into and then misappropriate the Bobker Group's equity and profits in this project.

100.     In or about May 2006, the Hale LLCs received an offer from Alexander Gurevich, a developer, to purchase the Hale Project for approximately $18.5 million.  The Hale LLCs accepted the Gurevich offer and instructed their attorney to prepare a contract.   The Hale LLCs also advised Lee, at Grand Pacific, and Chang, at Chinatrust, about the Gurevich offer.

101.     In response to the purchase offer, Lin and Lee asked the Hale LLCs not to proceed with the Gurevich offer and advised that Grand Pacific wanted to enter into a deal with the Hale LLCs in connection with the Hale Project.  Lee also represented that:  (a) Grand Pacific would provide funds in the form of an equity infusion equivalent to match Gurevich's offer; and (b) Grand Pacific would obtain construction financing from Chinatrust, which the Hale LLCs would need to complete the Hale Project.

102.     In addition to inducing the Hale LLCs to pass on the Gurevich offer, based on Grand Pacific's representations and promises to obtain construction financing, the Hale LLCs retained Joseph Klaynberg at WonderWorks Construction  to act as construction manager on the

Hale Project. Lee assured Klaynberg that Grand Pacific would obtain the needed construction financing. Based on Lin and Lee's influence with Chinatrust -- which Lin and Lee demonstrated previously in connection with several loan transactions involving the Bobker Group and the contractor -- the Hale LLCs and the contractor relied upon Grand Pacific's representations, which Lin, Lee and Grand Pacific knew to be false at the time.

103.    Over the ensuing weeks, Lee and Lin, with Grand Pacific's knowledge and approval, negotiated the parameters of the venture with the Hale LLCs. Relying upon Lee's and Lin's continuing promises to form the LLC Partnership, the Hale LLCs declined Gurevich's $18.5 million offer. This was a "clean" offer that imposed no restrictions on how the sellers could use the proceeds of the sale.

104.    In various communications with Joe Bobker during the summer of 2006, Lee – who was the Senior Vice President of Grand Pacific at the time -- demanded that part of the proceeds from the White Plains  closing be used to pay off Fifth Field and Global One investments on other  unrelated real estate development projects, together with interest and fees. This was in contradiction to the original deal that the Bobker Group agreed to — to use these funds to pay off a $2.3 million Grand Pacific loan at "Morgan Lofts" (another Bobker Group project under construction at that time with CTB as construction lender).

105.    Lee's objective, which he did not disclose to the Bobker Group at the time, was to ensure that funds flowed from Grand Pacific (via the use of the White Plains property as security for the funding) back to the entities that Lee, Lin and the Secret Affiliates secretly controlled. When Bobker Group balked, wanting to stick to the original deal of retiring an existing Grand Pacific loan, Lee threatened to use his influence with both Grand Pacific and China Trust Bank to cripple Bobker Group's current deals and banking relationships.

106.    Lee knew that it was critical, at that point in the development of the "Morgan Lofts," for the Bobker Group to maintain the necessary financing from these banks. From experience with these two banks the Bobker Group was aware that Grand Pacific, Lin and Lee "controlled" the money flow from CTB through their relationship with Tony Chang, an executive at CTB.  Thus, having no other choice, the Bobker Group was forced to comply with Lee's demands regarding the use of the proceeds of the Grand Pacific funding.

107.    Lee, Lin, Heinemann, Jeffrey Koo, Jr., A.Koo, Fifth Field LLC and Varsos, without the knowledge of the Bobker Group, colluded to divert funds and benefits to themselves by using both their power and influence in Grand Pacific and their knowledge of Bobker Group's projects and funding needs.  Specifically, Lee, Lin and the other Crossclaim Defendants coerced the Bobker Group (through misrepresentations, lies and threats) to enter into a LLC Partnership with Grand Pacific as lender and the Secret Affiliates as members for the sole purpose of gaining access to the funds invested by Grand Pacific into Bobker Group's Hale project to benefit themselves personally at the expense of the Hale projects.    To that end, as a last minute condition to closing, Lee (acting as Grand Pacific's representative) forced the Bobker Group to use the majority of the proceeds from Grand Pacific's $7 million loan to the Hale Project not for the benefit of the Project, but rather to pay off previous investments to entities owned and controlled secretly by Lee, Lin and the other Crossclaim Defendants.  Thus Lee and Lin's motives for misleading Bobker Group into foregoing a lucrative sale to Gurevich and rather entering into a transaction with Grand Pacific became clear.   They needed the Bobker Group to enter into a deal  with Grand Pacific solely to tap into the Bobker Group's equity in the Hale Project and coerce the Bobker Group to use the proceeds of the Grand Pacific funding to pay off previous investments of Crossclaim Defendants on unrelated projects and, specifically to Lee and Lin, to enrich themselves personally by way of inflated fees and "kickbacks".

108.    To that end, Lee and Lin misled the Bobker Group with a series of lies-as outlined herein--all designed to entice the Bobker Group to forego its sale to Gurevich and enter into the venture with Grand Pacific.

Grand Pacific Lies About the "Outside" Investors and Construction Financing

109.    At this time, Grand Pacific promised to obtain construction financing for the project from Chinatrust even though Grand Pacific had no intention of doing so.

110.    Shortly before the scheduled closing, Grand Pacific, through Lin and Lee, advised the Bobker Group that Grand Pacific could not invest the previously promised $10 million into the LLC Partnership and was limited to making a $7 million investment.

111.    To assist in the shortfall of equity, on or about July 19, 2006, Lee and Lin advised the Bobker Group that Grand Pacific had secured a "deep-pocketed", "outside" investor to provide the additional $3,000,000 in capital for the project. The investor was United Asian Funds, LLC ("UAF"), which would then assign its interest in the Hale entities to two other investors that Lee and Lin produced: Global One and 366 Madison.  However, Lee and Lin insisted that both Global One and 366 Madison must not be listed in the operating agreements for the Hale entities.

112.    Global One and 366 Madison were not "outside investors" but were affiliated with Grand Pacific.  Moreover, UAF was not "deep pocketed" at all but a shell company designed to hide the Koo family's ownership from the Grand Pacific staff, Financial One staff, CTB staff, State and Federal banking regulators, the Bobker Group, other Members of the LLC, the guarantors and borrowers.

113.    However, at this time, the Bobker Group was unaware that UAF's owners were also the owners and controllers of Grand Pacific, specifically members of the Koo family, with senior Grand Pacific executives acting on their behalf to keep their identities a secret.

18

114.    The Bobker Group would never have agreed to the deal that gave Grand Pacific and the Secret Affiliates an unfair "playing field" in the LLC that allowed them to wipe out the Bobker Group's interests while preserving the Secret Affiliates' interest by merging it into ownership via a foreclosure action.

Grand Pacific Forces Bobker Group to Pay-Off GP's Secret Affiliates
In the Hale Project by Withholding Funding On an Unrelated Project
Until Payment Is Made

115.    Lee demanded that Joe Bobker supply a guaranty regarding the $7 million GP loans, but did not require that Joe Bobker provide any supporting financial information, or, even his social security number, consistent with Lee's assurance that his guaranty, per Lee's promise, was "just for the files" and "would never be enforced."  Grand Pacific, Lin, Lee, Heinemann, Varsos, and the Underwriting Committee, accepted the undocumented guaranty that Bobker provided. However, unbeknownst to Bobker, Lee provided a fake SS number to his Underwriting Committee after Bobker refused to provide it.

116.    Lee subsequently advised Joe Bobker that a fake Social Security number had been "accidentally" used during Grand Pacific's underwriting process. Bobker immediately protested to Lee, both orally and in writing, based on Lee's prior representations that Bobker would not have to provide any financial information at all.  Lee apologized for his "mistake," and assured Bobker that he had "taken care of the mistake" and again assured Bobker that the guaranty was never intended to be effective and the removal of the false Social Security number would not harm the funding.  Although Joe Bobker relied upon Lee's apology and his representation, Lee, Grand Pacific and its Credit Committee knew that Lee's representation was false at the time it was made.

117.    The Bobker Group, Grand Pacific and these secret affiliates (Global One, 366 Madison, and UAF)[3] closed on the Hale Project in August 2006.  Grand Pacific contributed a total of $7 million in the form of a second-lien loan and a mezzanine loan, both of which were subordinated to the prior first-lien mortgage and the additional $1 million provided to the Bobker Group by Sterling Bank for the Hale Project.  Plaintiff's Secret Affiliates also provided a $3 million equity contribution to the Hale Project in return for a 20% Membership Interest.

118.    However, the Hale LLCs received almost nothing from Grand Pacific's $7,000,000.  Grand Pacific withheld approximately $1.23 million, representing fees, costs and an interest reserve.  In addition, Grand Pacific, Lin and Lee demanded that another $5.25 million go towards the following (none of which are related to the Hale Project):

> a. paying Fifth Field, a company controlled by Lee and secretly owned by Lee and Lin, $720,000  in connection with its previous investment in Morgan Lofts; [despite the fact that Fifth Field  had already been paid off on August 20, 2005]
>
> b. paying Global One, a company owned by Andre Koo and controlled by Lin approximately $660,000 in connection with its previous investment in Morgan Lofts;
>
> c. retiring a $2 million loan from Grand Pacific on an unrelated project (94th St);
>
> d. paying a $400,000 "exit fee" to Fifth Field, a company  controlled by Lee and secretly owned by Lin and Lee with respect to an unrelated project (94th St);
>
> e. paying $200,000 to EAE, LLC, a company owned and controlled by Lee (for services never rendered);
>
> f. paying $1,250,000 to Fifth Field LLC, a company controlled by Lee and secretly owned by Lee and Lin, for miscellaneous "fees," for which Fifth Field, Lee, and Grand Pacific have refused to supply a detailed breakdown, despite repeated requests from the Bobker Group.  However, subpoena

---

[3] Hereinafter, with the addition of Fifth Field, the "Secret Affiliates".

responses reveal that of this $1.25 million and the $400,000 "exit fee" (above) that Fifth Field took:

    i.   $1,075,000.00 and promptly paid it to Cherry Ave. Corp on August 30, 2006, a company owned and controlled by Michael Lin;

    ii.   $100,000.00 that was paid on August 28, 2006 to Dahan Realty, yet another "straw" company owned and controlled by Michael Lin;

    iii.   $250,000 that was paid on August 25, 2006 to 366 Madison; another company where Lin is a co-director with James Huang, an Executive Director and Senior Vice President of Financial One, and secretly owned by Jeffrey Koo Sr.,

    iv.   $100,000 that was paid on August 30, 2006 to 366 Madison; and

    v.   $56,000 that was paid on October 24, 2006 to 366 Madison.

119.    In this way, Lee, Lin, Heinemann, K. Huang, James Huang, and Varsos were able to siphon money from the Grand Pacific loan proceeds on Hale through the Secret Affiliates as controlled by senior officers of Grand Pacific and top executives at Financial One, into accounts held for their personal use.

120.    As a result, Lee and Lin diverted most of the loan proceeds from the Grand Pacific funding to their secretly affiliated investor entities, namely, Global One, 366 Madison, Fifth Field, Dahan Realty, Cherry Ave. Corp, and EAE Funding, which were controlled by Grand Pacific, Lee, Lin, James Huang and the Koos.  As a result, the Hale LLCs' equity in the Hale Project --- which Gurevich had offered to purchase at a substantial profit with no restrictions on the proceeds from the sale --- became overly burdened and further at risk because of the manner in which Grand Pacific structured the "investment loans".  This caused almost all of the proceeds from the funding to flow back to top executives and the owners at Grand Pacific, specifically, Lee, Lin, and the Koos through the straw companies controlled by them, Global One, 366 Madison, and Fifth Field.

121.    Lee, Lin and Grand Pacific thus orchestrated secret, illegal self-serving payoffs by recycling the proceeds of their Company's Grand Pacific's loan to the Hale Project back to the Secret Affiliates. This made their investment into the LLC risk-free, and leaving the Bobker Group's $4 million equity at full risk.

122.    On information and belief, Lee, Lin, Varsos, Heinemann, and the Koos benefited individually from the monies diverted from the Hale project into the accounts of Global One, 366 Madison, Fifth Field, and others.

123.    Additionally, in or about October of 2006, Grand Pacific insisted that in order to ensure that the senior Sterling loan of $5,500,000 remain current for at least a year, that the Hale entities borrow an additional $1,000,000 from Sterling and use the proceeds as an interest reserve for the Sterling loan (collectively, the Sterling Notes) and "soft costs" for the project (i.e. to pay architects, engineers, city fees, etc).

124.    On information and belief, Crossclaim defendant, Varsos, was aware of the fraudulent and self dealing nature of these transactions having been intimately involved in the financing of the Hale project as the head of the accounting department of Grand Pacific (having been since promoted to Senior Vice President of Grand Pacific Finance Corp.) and appearing as the signatory on the deed to Grand Pacific's main offices at 41-99 Main Street, Flushing, New York, between Grand Pacific Main Street Development, LLC and 366 Madison

125.    On information and belief, Crossclaim defendant, Heineman, was aware of the fraudulent and self dealing nature of these transactions having been intimately involved in the financing of the Hale project as the president of Grand Pacific.

126.    On information and belief, Lin, Lee, and the Koos received monies improperly diverted from the Hale Project through the above mentioned straw companies in their individual capacities.

Grand Pacific Colludes with its Parent Company
To Acquire the Hale Project from the Hale LLCs

127.    In or about June 2007, the Hale LLCs requested Grand Pacific to arrange construction financing to proceed with the Hale Project.  Grand Pacific and Chinatrust, both controlled by the Koo family, informed the Hale LLCs, however, that they would not be able to provide construction financing, despite the representations made one year earlier by Grand Pacific to the Bobker Group to persuade them to reject the Gurevich offer of $18.5 million and to proceed instead with the proposed transaction with Grand Pacific (and, unbeknownst to the Bobker Group) its secretly-affiliated investors.  Chinatrust and Grand Pacific made multiple excuses, ranging from the loan request being too high to their sudden concern about the neighborhood.

128.    However, Tony Chang (Senior Vice President/Group Head at China Trust Bank and Lee and Lin confidant), Lin and Lee knew all along that China Trust Bank could not make the loan because, on July 21, 2006, Jeffrey Koo Jr., was forced to resign as chairman of the Chinatrust Commercial Bank and reprimanded by the Financial Supervisory Commission (FSC) for, among other things, misusing overseas funds, breach of trust and illegal trading of stocks. Since they were still "under watch" by regulators, Tony Chang did not want China Trust Bank, controlled by Jeffrey Koo Jr.'s father, to reenter the Hale projects (by June 2007, Jeffrey Koo Jr., was a fugitive wanted by the Hong Kong police. He is now serving nine years in prison).

129.    Additionally, China Trust Bank was having its own financial difficulties and was placed on the "watch list" by US regulators, and forced to cut back lending and increase its capital.

130.    Grand Pacific, China Trust Bank, Chang, Lin and Lee were aware of the above but failed to disclose it to the Bobker Group.

131.     In or about the autumn of 2007, Sterling's senior loan with respect to the Hale Project was about to mature.  The Hale LLCs issued a "capital call" to their members, which included the Secret Affiliates, crossclaim defendants, Global One, 366 Madison and UAF.  The investors did not respond-- and to this day have not responded.  The Hale LLCs then requested Grand Pacific , to advance additional capital for the Sterling indebtedness. Grand Pacific refused, and asserted that it was short of funds.

132.     Instead, near the end of 2007, Grand Pacific entered into an agreement with Sterling Bank and began paying the interest on Sterling's senior loan from January 2008 (with respect to the $1 million loan) and June 2008 (with respect to the $5.5 million loan).

133.     In January 2008 Grand Pacific advised the Bobker Group in writing that Grand Pacific was "not willing nor able" to pay Sterling.  Grand Pacific knew that this statement was a misrepresentation and a lie at the time.

134.     Instead, upon information and belief, 366 Madison secretly transferred the funds to Grand Pacific, which Grand Pacific then used in January 2008 and June of 2008 to acquire the Sterling notes on the Hale properties to thus become Defendants' sole creditor.

135.     Specifically, Grand Pacific acquired aforementioned Sterling Notes of $5,500,000 and $1,000,000.  Since it wore "several hats," being both the lender and in cahoots with the Secret Affiliates, Grand Pacific could (unfairly) choose whether to classify the Sterling payments as capital to the partnership or as additional debt. Grand Pacific saw an opportunity to "wipe out" the Bobker Group, so in breach of the LLC Agreement and in a breathtaking act of "bad faith," Grand Pacific elected to financially cripple the project by acquiring these notes not as capital but as additional debt. It then immediately declared the loans in default, demanded a 24.9% default rate, initiated this foreclosure action, and another action in New York Supreme Court.

136.   Grand Pacific was aware that this course of action would obliterate the Bobker Group's $4 million equity while still preserving the Secret Affiliates' $3 million equity which, although it was unsecured equity, would end up owning the land together with Grand Pacific after a foreclosure sale because of the secret common ownerships between the lender Grand Pacific and the LLC Members, 366 Madison and Global One.

137.   Grand Pacific's actions were made further illegal by Grand Pacific utilizing its fraudulently obtained Inter-creditor Agreements with Sterling as the vehicle through which to foreclose.  Grand Pacific did not divulge to Sterling that their senior executives were also secret partners in the Hale ownership.  Sterling would never have given such rights-- intended traditionally for third-party bona-fide "lenders" --to Grand Pacific had they known it had a secret participation as owner in the Hale Project.  Sterling would have insisted that all the other partners be given the same rights.

138.   Although the Secret Investors and Grand Pacific were not forthcoming, the Bobker Group continued to advance additional funds into the partnership in order to keep the project moving forward and maintain its value.  These funds were advanced as capital and not as debt to the partnership. At that point, the Bobker Group was unaware of the secret affiliation between the lender and Member.

139.   Clearly, Grand Pacific no longer had any compunction about abandoning its' affiliate's obligations to their partner, the Bobker Group, and was now on a campaign to acquire all of the Bobker Group's equity in the Hale project thereby protecting their, and those of 366 Madison and Global One, equity positions at the expense of those of the Bobker Group.  Once Grand Pacific acquired these notes from Sterling, Grand Pacific became the sole creditor of the Hale entities. The Secret Affiliates, although technically holding an unsecured equity position behind more than $13.5 million of secured debt, which included their own money undisclosed to

the LLC or its Members, were now at no risk and simply had to wait for a foreclosure to merge their interests with Grand Pacific and own the Hale project debt free and with no more partners (since the Bobker Group's equity would be wiped out at the sale).

140.    Grand Pacific and the Cross-claim defendants' secret structure allowed them to hedge their bets, an option the Bobker Group never had.  If the project went well, they got their profits through their equity position in the partnership. If the Project went bad, they could rely on preserving their investment by "piggy-backing" along a Grand Pacific foreclosure action and by secretly investing their own capital into the Grand Pacific loan(s).

141.    Foreclosure by Plaintiff on the Hale properties would divest the Bobker Group of any equity in the Hale Project, would grant title of these properties to Grand Pacific and immediately merge with the equity of the Investment Defendants who are one-and-the-same thus "wiping out" the Bobker Group while still preserving the Investment Defendant's equity and giving them an unfair priority over the other members in the LLC, namely the Bobker Group.

142.    In late 2007 and early 2008, with no construction financing forthcoming from Chinatrust or Grand Pacific, and no response from the "investors" for additional capital, the Hale LLCs attempted to negotiate a restructuring of Grand Pacific's $7 million in the Hale Project.

143.    The Bobker Group, with Grand Pacific's knowledge and consent, entered into negotiations to allow Gurevich and Lehman Brothers to join the Hale Project as partners in return for sufficient capital to prevent foreclosure of both the Sterling acquisition notes, and the Grand Pacific debt, and provide construction financing.

144.    During these negotiations, the Secret Affiliates, through Heinemann, Grand Pacific's President, Varsos, Lee and other Grand Pacific and Financial One officers (inclusive of Crossclaim Defendant, Ted Chen, a director of Grand Pacific and Financial One executive from California) indicated that they were more concerned with protecting the interests of the Secret

Affiliates, who were their "bosses," than Grand Pacific's interests. Heinemann, Varsos and Lee insisted that the Secret Affiliates' unsecured equity investment of $3 million be repaid before Grand Pacific's secured priority investment/loan.

145. Due to this unreasonable demand of Grand Pacific that the Secret Affiliates' $3 million investment be paid first from any new incoming capital before any restructuring of Grand Pacific's $7 million loan claims, the negotiations for new capital from Gurevich and Lehman Brothers failed.

146. Since both the debt and the equity in the deal were controlled by Grand Pacific executives, they were able to act in unison to squeeze out their own partners, the Bobker Group, by, among other things, insisting that the UAF, 366 Madison and Global One investments get paid off as a priority.

147. Acting for the benefit of the Secret Affiliates at the expense of the Hale LLCs, Grand Pacific and the Secret Affiliates breached their duties as to act in good faith, by insisting that the Secret Affiliates be first repaid their $3 million dollar investment before any further financing could be obtained. This request by Grand Pacific was a breach of good faith duty to the Hale LLCs, as Grand Pacific was acting improperly for failing to act as a lender and providing a payoff amount upon request.

148. Between July 2007 and early 2008, Lee's efforts to "rescue" the $3 million became more and more bizarre and "unhinged." He blamed it on pressure from "Headquarters in Taiwan." His attempts, which include but are not limited to the following, show that Grand Pacific considered their $7 million loan and the $3 million Member contribution as being linked to each other.

149. GP's acts of interference and bad faith include:

a.  When asked by Bobker Group how much Grand Pacific was willing to accept as a payoff on its $7 million notes, Grand Pacific demanded, in writing, $8.5 million, a 20% premium. When asked why it was seeking more than it was owed, Grand Pacific replied that it considers its investment $10 million, not $7 million, thus confirming its secret interest in the Secret Affiliates $3 million equity investment.

b.  In June 2007, Lehman Brothers offered to pay off the Sterling mortgages as part of a new joint venture with Grand Pacific and Gurevich. Grand Pacific accepted the offer on condition that Lehman also pay-off the $3 million equity piece.  Lehman was unwilling to do a distressed work-out deal where certain existing Members received a "cash out."  Lehman therefore did not proceed.

c.  In February 2007, Grand Pacific offered to convert the "Secret Affiliates'" $3 million equity investment to a note from Grand Pacific in return for a "preferred return of 25%." This was an economic impossibility.

d.  On or about September 2007, Grand Pacific turned down a $5 million cash offer for its $7 million loan from Joe Klaynberg, the General Contractor and the Managing Member of the Hale LLCs.  Grand Pacific rejected the offer unless Klaynberg also bought out the $3 million Membership equity at the same time. Unbeknownst to the Bobker Group at the time, Grand Pacific's loan had been paid down to $5 million by way of a $2 million "participation" from the Member of the LLC, Madison. Joe Klaynberg's offer would have totally paid of the balance of Grand Pacific's $7 million loan. Bobker Group urged Grand Pacific to accept this cash offer but they refused.

e.  On September 21, 2007, Grand Pacific again reiterated that it would not discuss any pay off on its $7 million unless the additional $3 million was paid to their investors, with absolutely no regard to the Bobker Group's legal position and $4 million equity investment of its own.

f.   In June 2007, and ongoing through to early 2008, Lee and Lin attempted to "extort" from the Bobker Group two free-and-clear units at an unrelated project (Morgan Lofts) in exchange for using their influence and position at Grand Pacific to ensure a work out between Grand Pacific and Bobker Group. Specifically Lee insisted on unit number 704 (listed at $720,000) and Lin insisted on unit number 801 (listed at $1,153,000).  Lee demanded that these two units be transferred to Fifth Field LLC (controlled by Lee and owned  by Lee and Lin) and to Dahan Realty, LLC (controlled and owned by Lin) "no later than June 20, 2007." Bobker Group refused.

g.   In July 2007, Lee suggested that Bobker Group transfer the Secret Affiliates' $3 million equity in White Plains to other unrelated Bobker Group projects, again, an attempt to protect the $3 million ahead of the others.  On July 9, 2007, Lee asked that, in return for taking care of Sterling and releasing the Joe Bobker guarantee, that Bobker Group, "turn over the key, assign BG's interests in other unrelated projects and to pay the $3 million to investor." BG refused.

h.   After Bobker Group balked at all these unreasonable demands and threats, Lee sent an email in January 2008 to Bobker Group with a final warning that if there was no cooperation "GP will take over the project one way or the other."

i.   On March 20, 2008, the threats from Lee escalated. Joe Bobker was informed that Grand Pacific would pursue his personal guaranty on the $7 million loans if the Investor's $3 million equity was not paid off in full.  Grand Pacific then offered to fully release Joe Bobker from his guarantee on the $7 million in return for a $3 million payment to the investors. Joe Bobker refused because Joe Bobker had no legal obligation whatsoever to the $3 million investors and Grand Pacific knew that.

j.   Grand Pacific and the Secret Affiliates had undisclosed "side deals" prior to the closing in regard to who was funding the $7 million loan. Madison, the

Member of the LLC, in breach of the terms of the LLC, conspired with Grand Pacific to secretly invest $2 million into the $7 million. Thus Grand Pacific's actual loan exposure was always $5 million, not $7 million, at a time when it was demanding $10 million from the Bobker Group. Furthermore, when Grand Pacific demanded an interest reserve at the closing of its loan, it inappropriately included funds to secretly pay the interest to the Member on his $2 million portion of the $7 million. These checks to Madison from Grand Pacific were signed by Heineman, the president of Grand Pacific, and other Grand Pacific employees. Furthermore, by demanding a personal guarantee on the full $7 million, Grand Pacifice manipulated the documentation so that Joe Bobker was also guaranteeing the return of $2 million to a Member of the LLC. Joe Bobker would not have done this had he been aware the funds were mingled in breach of the LLC agreement.

150.    In and about the middle of 2008, Varsos received an offer of several million dollars for the Hale project from yet another client of Grand Pacific, Joe Wai Leung Chan's, Varsos never replied to this offer, never relayed this offer to the Bobker Group, and consequently failed to take the opportunity to mitigate the damages suffered by the Bobker Group and others involved in the Hale project.

151.    Upon information and belief, other offers were made which Grand Pacific either rejected or failed to communicate to the Bobker Group, which would have mitigated the damages suffered by the Bobker Group and others involved in the Hale project. In response to these offers, Grand Pacific inappropriately demanded $10 million to pay off their loan at a time when $3 million was Membership equity in the LLC and $2 million was capital used by Madison to pay down the $7 million loan.

152.    Grand Pacific's motives became clear after Lee and Lin were subsequently fired from their positions at Grand Pacific and Lee admitted to Joe Bobker and the Hale LLCs in late

2008-early 2009 that the Secret Affiliates are owned and controlled by members of the Koo family, Lin, "Lin's friends," and other Financial One executives.  Lee also admitted that:

a.  the purpose of these entities was to conceal the equity participation of these individuals in the Hale Project from, among others, the Hale LLCs and the auditors for Financial One and Grand Pacific, while the same individuals simultaneously controlled Grand Pacific and Financial One;

b.  Lin was investing funds for Jeffrey Koo, Sr., through Koo's secret investment vehicle, 366 Madison;

c.  Lin was assisting Andre Koo, the son of Jeffrey Koo Sr., a long time family friend, who had fled Taiwan in late 2006 following an investigation by Hong Kong regulators.  (Note: Koo, Jr. has now been convicted as of October 18, 2010 and sentenced to 9 years for violating the Securities and Exchange Act and the Banking Law of Taiwan[4] and embezzling US$9.57 million and remitting the remaining US$20.90 million acquired from illegal financing to overseas units of China Trust Financial, US$20.4 million of which was wired overseas in 2005 and, on information and belief, part of the US$3 million of which was routed through Global One, Global Holding Corp. and other Lin-controlled entities, into the Hale Project);

d.  Heinemann had been aware of Lin and Lee's secret investments and "looked the other way in order to keep his cushy job";

e.  Varsos had been aware of Lin and Lee's secret investments; and also "looked the other way in order to keep her job and be promoted";

---

[4] In fact, shortly after Koo's conviction per an article dated October 19, 2010 Jeffrey Koo, Jr. was convicted of using straw companies to hide his identity and to funnel money offshore into various deals. This is the very definition of money laundering. As a result of Mr. Koo, Jr.'s conviction, another article by StockMarketsReview.com, dated November 19, 2010, announced that Financial One Corp. (the parent company of Grand Pacific and most of the other companies involved in the Hale project) announced that it has suspended trading and is "planning to seek a voluntary delisting of the company from the Singapore Exchange". The effect of this would be that Financial One would not have to disclose the "illegal" activities of its Grand Pacific subsidiary in the US.

f.   Grand Pacific had been forced to strip Lin of any loan approval authority after complaints of corruption;

g.   Lee had never corrected his "mistake" on Joe Bobker's Social Security number; and acknowledged that without his tampering with the Grand Pacific underwriting and using a fictional Social Security number the loan(s) with Grand Pacific would never have closed and he would not have been able to generate the funds back to himself, Lin, and the Secret Affiliates.

h.   Lee acted as a conduit for Michael Lin and Koo family's monies to help hide their ownership, not just in Hale but also in Morgan Lofts and other Grand Pacific projects unrelated to the Bobker Group; and

i.   Lee, Lin and Chang knew at the time of the closing on the Hale Project that CTB was going through its own financial and regulatory difficulties and wouldn't be doing the construction loan he promised.

j.   That one of Grand Pacific's *modus operandi*, and not only used by Lin and Lee but by other executives and staff of Grand Pacific and the Credit Committee as well, was to seek mortgable equity in borrower's projects and, via the "carrot-and-stick" approach, use their influence at Grand Pacific and China Trust Bank to generate the loans required in order to benefit personally from their customer's dealings by way of demanding fees that their company was unaware of.

153.   It thus became clear that Grand Pacific employees (including Heinemann, Varsos, K. Huang, Lin and Lee), through their control of Grand Pacific and its investment decisions, set out to use Defendants' equity in the Hale Project as a conduit to pay Cross-Claim Defendants' while at the same time providing their "boss," the Koo family, with an investment in the Hale

Project that enjoyed an unfair and secret advantage over the $4,000,000 invested by the Bobker Group.

Grand Pacific Causes Its Partners to be Further Indebted and Calls in the Loans

154.    Ted Chen was aware that a substantial part of the proceeds (over 65%) from the Financial One public offering allocated to the United States was used by GP executives not to "further the Co's business" as per the Offering Memorandum but to purchase the Sterling notes in a desperate attempt to "rescue" the secret $3 million investment of executives of Grand Pacific and Financial One.

155.    Plaintiff, at the direction of Ted Chen, elected to start this and the related action in New York County, in order to divert attention away from shareholders, directors and auditors in both Singapore and New York as well as from the officers of Grand Pacific and Financial One's to hide the corrupt underwriting of the  Hale notes and especially the identities of the $3 million dollar equity investors.

156.    On information and belief, and further based on two emails dated July 9, 2007 from Lee to Joe Bobker that "GP and investors can prolong or stall the process [and] not treat it as a default…and deal it with it next year" and "from corporate red-tape stand point...they [Headquarters] don't see it purely in the economical view...the new management would rather let it [the Grand Pacific mortgage] go 'bad' than deal with it [now] and [prefer to] make it a problem in the future." By starting these lawsuits Ted Chen hoped to "kick the can down the field" and make it appear to Financial One and Grand Pacific shareholders, directors, auditors and regulators, that the notes at issue here were simply run-of-the-mill real estate mortgages that had gone bad because of the economic downturn in the US real estate market and not a result of the

33

illegal money laundering devices assembled by senior officers of Plaintiff and affiliated entities, the Crossclaim Defendants. This delaying tactic is bad faith on behalf of the lender who is acting in concert with its affiliate investors in the Hale LLCs.

157.    Additionally, none of UAF, Global One, or 366 Madison ever communicated with the Bobker Group regarding their investments in the Hale entities from the time these "investment/loans" were made to the present. This would be bizarre in normal circumstances but not here because, as detailed above, Lee, Lin, Heinemann, Varsos, James Huang, K. Huang and the Koo's secretly controlled these entities along with Grand Pacific and therefore didn't need to communicate as Investors traditionally do.

158.    Defendants' wrongful conduct caused a complete loss of the Hale LLCs' equity in the White Plains Project. At all times, Grand Pacific, acted to enrich themselves and their own executives, who acted for their own personal profit, and to erode the Bobker Group's equity. Defendants and Crossclaim Plaintiffs seek compensatory damages, punitive damages, reclassification of all debt held by Plaintiff to equit, and expungement of all liens held by Grand Pacific and the Secret Affiliates.

The Bankruptcy Filing by the Hale Entities

159.    On March 25, 2015 (the "Petition Date"), 97-111 Hale, LLC and 100-114 Hale, LLC (collectively, the "Debtors") each filed a Chapter 11 petition in the United States District Court for the Southern District of New York. 97-111 Hale, LLC was assigned Case No. 15-22381(RDD), and 100-114 Hale, LLC was assigned Case No. 15-22382 (RDD).

160.    The Debtors have continued in possession of their property and management of their affairs as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

As and for a First Counterclaim and Crossclaim Claim
**(DISMISSED)**

161.   ~~Counterclaim Plaintiffs and Crossclaim Plaintiffs repeat and incorporate Paragraphs 1 through 168.~~

162.   ~~Grand Pacific, acting with the knowledge and approval of Lee, Lin, Heinemann, the Huangs, the Koos and Varsos (the "Individual Crossclaim Defendants"), and the Secret Affiliates, made intentional and fraudulent misrepresentations to the Hale LLCs concerning, *inter alia*, the formation and operation of a partnership between Grand Pacific and the Hale LLCs to pursue development of and profit from the Hale Project, and Grand Pacific's funds were disbursed in a manner that benefited Grand Pacific and the Secret Affiliates; the independence, identity and the financial strength of the Secret Affiliates; and Chinatrust's willingness and availability to provide subsequent construction financing for the Hale Project.   All such representations and/or promises were false at the time that they were made.~~

163.   ~~In addition, Lee and Lin operated and/or controlled the Secret Affiliates at the direction of, or with the knowledge and approval of Financial One, Grand Pacific, and Jeffrey Koo, Jr.  Lee's and Lin's misrepresentations to the Hale LLCs and Joe Bobker in order to facilitate the Secret Affiliates' equity investment in the Hale Project were undertaken with the knowledge and approval of Financial One, Grand Pacific, Heinemann, the Huangs, the Koos and Varsos.~~

164.   ~~The Hale LLCs, and Joe Bobker reasonably relied upon the misrepresentations and/or false promises alleged herein by, *inter alia*, declining a *bona fide* offer of $18.5 million with respect to the Hale Project; agreeing to proceed with Grand Pacific as a partner to develop the Hale Project, with the participation of the Secret Affiliates; and with a distribution of~~

proceeds as required by Grand Pacific; and accepting funds from and distributing membership interests to the Secret Affiliates with respect to the Hale Project.

165.    As a result, the Hale LLCs, and the Bobker Group have sustained substantial damages, which include the loss of the Gurevich offer, the loss of the Hale LLCs' equity in the Hale Project; the loss of substantial funding from Grand Pacific to develop the Hale Project; the loss of capital contributions from Grand Pacific and the Secret Affiliates with respect to the Hale Project for, among other things, payment of the senior Sterling loans.  In addition to these losses, Grand Pacific also used the acquisition of the Sterling notes to cripple the partnership's ability to complete the project and to foreclose on the Hale LLCs' interests.

166.    Accordingly, the Hale LLCs, and the Bobker Group are entitled to recover damages for fraud, jointly and severally, from Grand Pacific, the Individual Crossclaim Defendants, the Secret Affiliates, and Financial One in an amount to be determined at trial, but no less than $18 million.

167.    In addition, based upon the fraudulent and inequitable conduct of Grand Pacific, Lee, Lin, the Secret Affiliates, Financial One and Jeffrey Koo, Jr., Counterclaim and Crossclaim Plaintiffs are further entitled to the expungement of all mortgage-related notes with respect to the Hale Project.


As and for a Second Counterclaim and Crossclaim Claim
**(DISMISSED)**

168.    Counterclaim Plaintiffs and Crossclaim Plaintiffs repeat and incorporate Paragraphs 1 through 175.

169. ~~By virtue of and in connection with their partnership with the Hale LLCs with respect to the Hale Project, Grand Pacific and the Secret Affiliates owed fiduciary duties to the Hale LLCs.~~

170. ~~Grand Pacific breached its fiduciary duties to the Hale LLCs by engaging in, *inter alia*, the following conduct: making fraudulent misrepresentations to the Hale LLCs and to Joe Bobker, as alleged herein; fraudulently inducing the Hale LLCs and Joe Bobker to enter into a creditor-debtor relationship with Grand Pacific; forcing BG to borrow another $1 million from Sterling "ostensibly" for the benefit of the partnership; fraudulently inducing Sterling to sign InterCreditor agreements; fraudulently inducing Joe Bobker to sign a guaranty and then supplying a fake Social Security number; attempting to obtain repayment of the Secret Affiliates' investment ahead of other partners in the Hale Project; increasing the Project's indebtedness instead of reducing it by purchasing the Sterling notes as notes rather than paying them off with an appropriate contribution of capital; and by attempting to obtain title to the Hale Project by means of the instant action for foreclosure against its own partner.~~

171. ~~The Secret Affiliates breached their fiduciary duties to the Hale LLCs by engaging in, *inter alia*, the following conduct: serving as conduits for funds placed by or on behalf of Lee, Lin, James Huang, the Koos and Grand Pacific; attempting to recoup their investments in the partnership ahead of the Hale LLCs and Grand Pacific; and collaborating or colluding with Grand Pacific in positioning the Hale Project for foreclosure by Grand Pacific.~~

172. ~~Accordingly, the Hale LLCs are entitled to recover damages, jointly and severally, against Grand Pacific, the Individual Crossclaim Defendants and the Secret Affiliates based on breach of fiduciary duty, in an amount to be determined at trial, but not less than $18.5 million.~~

37

As and for a Third Counterclaim and Crossclaim Claim
**(DISMISSED)**

173.   ~~Counterclaim Plaintiffs and Crossclaim Plaintiffs repeat and incorporate Paragraphs 1 through 180.~~

174.   ~~In connection with financing for the Hale Project, Grand Pacific, the Individual Crossclaim Defendants and the Secret Affiliates, acting as agents for each other and with knowledge of and approval of each other's actions, took wrongful advantage of the Hale LLCs' financing requirements for the Hale Project.  As the closing for the joint venture acquisition for the Hale Project approached, Grand Pacific, on behalf of itself, the Individual Crossclaim Defendants and the Secret Affiliates, structured the financing and equity of the Hale Project such that they could control "both ends" of these investment monies for their own purposes. As a result of this wrongful conduct, a substantial portion of the joint venture proceeds was diverted to pay unrelated loans and investments of Grand Pacific and investor entities and other entities owned or controlled by Grand Pacific officers, and to pay unspecified fees to Grand Pacific, Lin, Lee and other Individual Crossclaim Defendants.   Grand Pacific and Secret Affiliates' actions have permanently deprived the Bobker Group of the funds to which they were entitled.~~

175.   ~~Accordingly, Grand Pacific, the Secret Affiliates, Lin and Lee are liable to the Bobker Group, jointly and severally, for damages based on conversion, in an amount to be determined at trial but no less than $6 million.~~

As and for a Fourth Counterclaim and Crossclaim Claim
**(DISMISSED)**

176.   ~~Counterclaim Plaintiffs and Crossclaim Plaintiffs repeat and incorporate Paragraphs 1 through 183.~~

177. ~~Grand Pacific represented to Joe Bobker and the Hale LLCs that it wished to enter into a partnership for the development of, and eventual profit from, the Hale Project.  In connection with Grand Pacific's joint venture investment for the Hale Project, in which Grand Pacific contributed equity funds toward matching the outside offer that they induced the Hale LLCs to decline, Grand Pacific and Lee represented to Joe Bobker that Grand Pacific would require Bobker's signature on a personal guaranty that would not become effective, but would be maintained "just for the files," and would not be considered in the traditional context of a lender/borrower relationship  Grand Pacific's and Lee's representations were false when made.~~

178. ~~Bobker justifiably relied on the misrepresentations described above, and submitted a guaranty to Grand Pacific and Lee without any authorization for Grand Pacific to conduct any investigation concerning Bobker's assets or financial means with respect to the guaranty.  In addition, and in reliance on the representations described above, Bobker did not supply his Social Security number on the guaranty form that he submitted to Grant Pacific and Lee.~~

179. ~~Just prior to the closing of Grand Pacific's investment with respect to the Hale Project, Lee inserted a fake Social Security number for Bobker in the guaranty, and admitted to Bobker that he did so "by mistake" and would rectify it, but Lee failed to do so.~~

180. ~~Grand Pacific and Lee have subsequently attempted to enforce the guaranty against Bobker, despite the earlier representations that the guarantee was not intended to be effective and "just for the files."  Bobker has been damaged thereby.~~

181. ~~Accordingly, Grand Pacific and Lee are liable to Bobker, jointly and severally, based on fraud, in an amount to be determined at trial, but no less than $7 million.  In addition, based upon the misconduct of Grand Pacific and Lee, Bobker is entitled to a judgment~~

~~determining that the guaranty form that he supplied to Grand Pacific and Lee is of no force or effect.~~

As and for a Fifth Counterclaim and Crossclaim Claim

182.    Counterclaim Plaintiffs and Crossclaim Plaintiffs repeat and incorporate Paragraphs 1 through 181.

183.    By reason of the foregoing, a serious dispute and justiciable controversy exists concerning, inter alia:  whether Grand Pacific holds enforceable notes with respect to the Hale Project; whether the Secret Affiliates are rightfully entitled to any enforceable equity interests in the Hale Project; whether Bobker's guaranty may be enforced by or on behalf of Grand Pacific; and whether Grand Pacific is entitled to foreclose any mortgage notes or enforce any promissory notes with respect to the Hale Project.

184.    Unless and until the rights of the parties are declared, the Hale LLCs and Bobker remain subject to claims by Grand Pacific and the Secret Affiliates for substantial damages.

185.    The Hale LLCs and Bobker have no adequate remedy at law.

186.    Accordingly, the Hale LLCs and Bobker seek a declaration by this Court pursuant to CPLR 3001, as follows:  (a) the Hale LLCs have no liability to Grand Pacific in connection with financing or equity investments in the Hale Project; (b) all liens held by Grand Pacific with respect to the Hale Project are of no further force or effect; (c) all guaranties with respect to the Hale Project are of no force or effect; (d) all funds that Grand Pacific utilized to acquire the Sterling notes constitute capital contributions with respect to the Hale Project and not loans and (e) Grand Pacific  are liable to the Bobker Group in an amount to be determined at trial.

As and for a Sixth Counterclaim and Crossclaim Claim
**(Monetary Judgment for Damages Arising out of the Fifth Counterclaim)**

187.   Counterclaim Plaintiffs and Crossclaim Plaintiffs repeat and incorporate Paragraphs 1 through 186.

188.   As a result of the forgoing, the Hale LLCs and Bobkers seek an award for monetary and compensatory damages arising out of Plaintiff's misconduct and wrongdoing set forth in the Fifth Counterclaim.

As and for a Seventh Counterclaim and Crossclaim Claim
**(Reclassification of Claim Under Section 502 of the Bankruptcy Code and/or Equitable Subordination Under Section 510(c) and 105(a) of the Bankruptcy Code)**

189.   Counterclaim Plaintiffs and Crossclaim Plaintiffs repeat and incorporate Paragraphs 1 through 188.

190.   Prior to the Petition Date, Grand Pacific acquired and held a direct or indirect interest in the Sterling Notes and the "Note and Mortgage" described above and in the Complaint asserted against the Debtors.

191.   To the extent Grand Pacific (with any subsequent successor or assign, "Grand Pacific") asserts a secured claim against the Debtors' bankruptcy estates on account of the Sterling Notes and the "Note and Mortgage", such claims should be (a) reclassified as equity interests in the Debtors, with all underlying liens arising therefrom discharged of record, or, in the alternative, (b) equitably subordinated in their entirety to all claims of the Debtors' estates.

192.   Grand Pacific engaged in and benefited from inequitable conduct, including but not limited to the following:

a.   Grand Pacific mislead the Debtors and induced the Debtors to reject the sale of the Hale Project to Gurevich and instead proceed to develop the Hall

Project with Grand Pacific's purported "deep pocketed" and "outside" investors;

b.   Grand Pacific interfered with the Debtors attempts to obtain funds from, or sell the Hale Project to, other investors;

c.   Grand Pacific forced the Debtors to pay off Grand Pacific's secret affiliates in the Hale Project by withholding funding on an unrelated project ,the Morgan Lofts Project;

d.   Grand Pacific colluded with its parent company to acquire the Hale Project from the Debtors;

e.   Grand Pacific, through its affiliates, acquired the Sterling Notes in violation of the Operating Agreement; and

f.   Grand Pacific prevented the Debtors from paying off the Note and Mortgage unless the Debtors and the Bobker Group paid off certain other loans made by Global One Corporation and 366 Madison, Inc.

g.   Grand Pacific demanded $10 million to pay off $7 million.

h.   Grand Pacific sold "participations" in its loan related to the Project to members of the Hale LLCs.

i.   Grand Pacific forged Joe Bobker's social security number to get Underwriting approval

193.   This conduct resulted in injury to Debtors' creditors and conferred an unfair advantage on Grand Pacific. This inequitable conduct has resulted in harm to Debtors' and to their entire creditor body, including all general unsecured creditors since:

a.   The Debtors, based upon Grand Pacific's representations and inducements, did not proceed with the sale of the Hale Project to Gurevich, which would

42

have resulted in (i) repayment in full to all of the Debtors' creditors, (ii) repayment to the Bobkers of $4 million in invested capital, and (iii) avoiding lost profits; and

b.   Grand Pacific's misconduct resulted in millions of dollars of unnecessary loans and interest accrual thereon, erosion or eradication of equity in the Hale Project with the funds wrongfully diverted from the Hale Project rather than credited against the Debtors' outstanding creditors.

194.   Under the principles of reclassification and equitable subordination and pursuant to §§502, 510(c) and 105(a) of the Bankruptcy Code, in equity and good conscience, Grand Pacific's claims arising out of the acquisition of the Sterling Notes and the "Note and Mortgage" should be reclassified as equity interests in the Debtors and all liens arising therefrom discharged of record. In the alternative, Grand Pacific's direct claims against the Debtors should be recalculated to reflect the accurate loan amounts and interest due, and subordinated to all the claims of the Debtors' creditors as such is consistent with the provisions of the Bankruptcy Code which authorizes a creditor's claim to be subordinated to the claims of other creditors.

## **REQUEST FOR RELIEF**

195.   Counterclaim Plaintiffs and Crossclaim Plaintiffs respectfully request that the Court enter judgment in their favor, granting the following relief:

(a)   dismissing all claims in Plaintiff's complaint, with prejudice;

(b)   awarding compensatory damages against Plaintiff and Crossclaim Defendants, jointly and severally, in an amount to be determined at trial, but in no event less than $24.5 million;

(c)   awarding exemplary damages in an amount to be determined at trial to deter Plaintiff and Crossclaim Defendants, and others similarly situated, from engaging in such conduct in the future;

(d)  awarding Counterclaim Plaintiff and Crossclaim Plaintiffs declaratory relief under the Fifth Counterclaim;

(e)  ordering Plaintiff and Crossclaim Defendants to pay interest on the damages from the date judgment is entered, until payment of the judgment is made;

(f)  For Counterclaim Plaintiffs' Sixth Counterclaim, awarding monetary damages;

(g)  For Counterclaim Plaintiffs' Seventh Counterclaim, an order (a) reclassifying Grand Pacific's claims arising out of the acquisition of the Sterling Notes and the "Note and Mortgage" as equity interests in the Debtors and discharging all liens arising therefrom of record; and, (b) subordinating Grand Pacific's direct claims to the claims of the Debtors' creditors;

(h)  awarding Counterclaim Plaintiffs and Crossclaim Plaintiffs their reasonable attorneys' fees and court costs; and

(i)  granting such other and further relief as the Court may deem just and proper.


Dated: New York, New York
       June 1, 2015

                              Respectfully submitted,


                              DELBELLO DONNELLAN WEINGARTEN
                              WISE & WIEDERKEHR, LLP
                              *Attorneys for the Debtors*
                              One North Lexington Avenue, 11th Floor
                              White Plains, New York 10601
                              (914) 681-0200


                              By: */s/ Jonathan S. Pasternak*
                                   Jonathan S. Pasternak

**VERIFICATION**

STATE OF NEW YORK        )

                                          ) ss.:

COUNTY OF NEW YORK    )


       Eli Bobker, being duly sworn, states:

       I have reviewed the foregoing Third Amended Verified Answer and know the contents thereof; the same is true to the best of my own knowledge, except as to those matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true

Dated:  New York, New York
       June 1, 2015

                             */s/ Eli Bobker*
                             Eli Bobker


*/s/ Steven Bakst*
Notary Public

STEVEN BAKST
NOTARY PUBLIC, State of New York
No. 01BA6088660
Qualified in Queens County
My Commission Expires March 10, 2019